UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S
US DISTRICT OF

NOV 2 4 2015

BROOKLYN OFFICE

------------------------------------------------------------x

DARNELL DAVISON,

                           Petitioner,

    -against-

THE PEOPLE OF THE STATE OF NEW YORK,

                          Respondent.

------------------------------------------------------------x

## MEMORANDUM & ORDER

12-CV-2362 (ENV)

VITALIANO, D.J.

     Between November 2006 and September 2007, two women, identified for purposes of this motion as ST and SB, were raped. Darnell Davison would later be arrested as their rapist. Both rape cases were adjudicated in a single trial, resulting in Davison's conviction on two counts of rape in the first degree; two counts of criminal sexual activity in the first degree; one count of sex abuse in the third degree; and two counts of rape in the third degree. Davison is currently serving an aggregated 15-year prison term, and is before this Court, pro se, on his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.

     The habeas petition asserts several challenges to Davison's convictions. His constitutional claims, principally, are that: (i) the prosecutor deliberately destroyed Brady material, which deprived him not only of exculpatory evidence but also of his Sixth Amendment right to confront the witnesses against him; (ii) ineffective appellate counsel hindered his efforts to correct the trial transcript, which, if corrected, would have resulted, at least, in a new trial; (iii) the trial judge's misconduct deprived him of a fair trial; (iv) the prosecutor deprived him of a fair trial in multiple instances of misconduct, including purposefully eliciting false testimony,

1



withholding exculpatory evidence from the grand jury, and improperly commingling in his summation evidence relevant separately to the two rapes; and (v) the evidence presented at trial failed to prove guilt beyond a reasonable doubt.[1]

For the reasons set forth below, various claims asserted in the petition are procedurally barred and, in all cases, regardless of their procedural propriety, are without merit. As a consequence, the writ is denied and the petition is dismissed.

Background

A.    History

Davison's jury trial was held in Queens County in May 2012 before Justice Sheri S. Roman. (Transcript of Record, People v. Davison, Indict. No. 2890/2007 (Sup. Ct., Queens Cty., 2008) ("Tr.") at 1.) The facts of the two rapes were set out by the People in a straightforward and orderly manner.[2] The first episode took place some time after November 16, 2006, the day SB, then 19 years old, met Davison while walking on a street in Brooklyn. She and Davison went on two dates together, neither of which included any sexual relations. On the third date, SB went with Davison to an apartment in Queens, where they began to watch a film. Davison tried to kiss SB, but she told him to stop. Davison then pushed SB onto a mattress and a struggle ensued during which Davison slapped SB in the face. Davison then offered to drive SB home. During the car ride, Davison stopped the car under an overpass, where he pinned SB down,

---

[1]    Davison previously raised many of these claims in his unsuccessful direct appeal. See People v. Davison, 92 A.D.3d 691, 691-92, 937 N.Y.S.2d 864 (2d Dep't 2012). Leave to appeal to the Court of Appeals was denied. People v. Davison, 18 N.Y.3d 993, 968 N.E.2d 1004, 945 N.Y.S.2d 648 (2012).

[2]    A summary of these facts is cohesively set out in the prosecution's opening statement (Tr. 369-81). Because Davison was convicted, the Court recites the facts in the light most favorable to the verdict. See Garbutt v. Conway, 668 F.3d 79, 80 (2d Cir. 2012).

2

pulled off her clothes, performed oral sex on her and penetrated her vagina with his penis until he ejaculated. During the assault, SB repeatedly told Davison to stop. Davison then dropped SB at a subway station. SB immediately went to her local police precinct, which escorted her to Wyckoff Hospital. A "rape kit" examination was performed, and DNA was recovered.

Approximately one year later, on September 14, 2007, ST, like SB, met Davison while walking on a street in Brooklyn. They exchanged telephone numbers and rendez-voused later that evening for a date at Davison's Queens apartment, where they watched a film. After the film finished, Davison began touching ST, who told him to stop. Davison did not stop but, instead, pushed ST onto a mattress and removed her clothes. Davison then put his mouth on ST's vagina. ST struggled and kicked Davison, and he bit her vagina. ST stopped struggling, and Davison penetrated her vagina with his penis until he ejaculated. Afterward, Davison drove ST home, and ST immediately called the police, who sent her to Brookdale Hospital, where, as in SB's case, a "rape kit" examination was performed. DNA was recovered in this case, too.

The DNA from ST's rape kit matched the DNA recovered from SB's. Using ST's phone records, police were able to identify ST's assailant as Darnell Davison. The DNA from ST's rape kit was tested against Davison's DNA, and it, too, was a match. Davison was arrested on November 1, 2007.

B.     The People's Case

The People's first witness was SB, whose testimony was as forecast in the prosecutor's opening. SB testified that she went to Davison's apartment in Queens, where, as they were watching a movie, Davison forcibly shoved her onto a bed. Tr. 414-15. SB managed to push Davison off, she said, and tried to run away, but the door leading out of the apartment was locked. Tr. 415-16. Davison caught up to SB, she claimed, and slapped her across the face. Tr.

3

416-17. Davison and SB then went outside, where Davison put his arm around SB like a "chokehold" and walked her forcibly to his car. Tr. 418-19. She told the jury how Davison drove off with her, but, later, parked the car under a bridge, where he began to kiss and fondle her. Tr. 419-20. He then pulled down her pants, performed oral sex on her and penetrated her vagina with his penis. Tr. 422-23. SB said she repeatedly told Davison to stop, but he did not. Tr. 423-24.

The People next called ST. ST testified that, on the evening of September 14, 2007, she was approached by Davison, spoke with him, and ultimately agreed to go with him to his apartment. Tr. 628-635. There, she and Davison sat on his bed and watched a film. Tr. 635-636. After the film ended, Davison, according to ST, began to touch her and told her that he wanted to have sex with her. Tr. 636-638. ST replied that she did not want to have sex with him. Id. Davison, ST says, then pushed her down and began to perform oral sex on her. Tr. 638-639. ST kicked Davison in the face, and Davison bit her vagina. Tr. 639. Davison then pinned down ST, according to her testimony, and put his penis inside her vagina. Tr. 641-642. After Davison finished his assault, he and ST left the apartment. Tr. 644. Once outside, ST tried to run away but Davison grabbed her and forced her into his car. Tr. 645. Davison dropped ST at her house, and ST ran inside and told her aunt what had happened before running upstairs and informing her mother. Tr. 646. Responding to the call for help, the police officers facilitated ST's removal to Brookdale Hospital, where, as she testified, a "rape kit" examination was done. Tr. 647-48.

Sheba Carson, ST's aunt, took the stand next and testified that about 2:00 a.m. on September 15, 2007, ST arrived at their house crying hysterically. She explained that she had

4

just been raped. Tr. 617-18. Carson also testified that she observed that ST's clothes were torn, her nails were broken off, and her hair was in disarray. Tr. 618.

The People then called Arlene Richards, a physician's assistant at Brookdale Hospital, who treated ST the morning after her rape. Tr. 765. Richards performed the rape kit examination as well as an external examination, which revealed swelling and tenderness of ST's vagina. The injuries to the vagina, Richards said, were consistent with a bite. Tr. 767-78.

Richards's testimony was followed by that of David Fisher, a criminalist at the Department of Forensic Biology in the Office of the Chief Medical Examiner. Fisher had examined the rape kit that was collected from ST's hospital visit. Fisher testified that the DNA found on the rape kit samples for SB and ST generated the same profile, which matched samples taken from Darnell Davison. Tr. 811-13.

Detective David Kellner, assigned to the Brooklyn Special Victims Squad, then testified concerning his investigation of SB's rape. His investigation took place before the case was transferred to detectives in Queens. Tr. 537-540. He became involved again in SB's case after receiving notice of a match between the DNA retrieved from SB's rape kit and that from ST's rape kit. Tr. 541-44. Detective Kellner had traced the cell phone number for ST's assailant to Darnell Davison, whom Detective Kellner identified in the courtroom. Tr. 545-46. He also confirmed that Davison's DNA matched the samples extracted from both rape kits. Tr. 553.

C.    The Defense Case

With constitutional overtones, petitioner attacked his prosecution on procedural grounds,[3] but also put on a substantive evidentiary defense. The defense called Denise Smith, a friend of

---

[3]    Before the start of trial, Davison moved to have the counts related to the rape of SB severed from those related to the rape of ST. The trial court denied the motion as untimely and

Davison's, to the stand as the lead-off witness. Smith was, generously, permitted to testify that she had been on several dates with Davison and had even slept in the same bed with him, and he was "always a gentleman." Tr. 872.

Police Officer Michelle Herbst, who took the rape report from SB the night of SB's assault, followed Smith to the stand. Herbst testified that she did not see any injuries to SB's face or body, nor did the victim's clothing appear disheveled or ripped, at least as she recalled it. Tr. 890-91.

Waiting in the wings was the defense's third witness, Police Officer Vandin Kontorovich, who had responded to a call from ST's home on the morning of September 15, 2007. Officer Kontorovich told the jury by the time he arrived at the house, ST was not hysterical, but that he could not recall the condition of her clothes or fingernails. Tr. 932.

Last, petitioner took the stand in his own defense. Placing his own credibility front and center before the jury, it was the classic "he said, she said." Davison told the jury that he and SB had consensual sex in his car, Tr. 961-62, and that at no time did she ask him to stop. Tr. 964-67. He also swore that he put on a condom before he began sexual intercourse with SB but realized after he ejaculated that it had broken. Tr. 966-68. Naturally, petitioner also claimed that he had engaged in consensual sex with ST at a house owned by ST's friend. Tr. 996-99. Davison said that at no point did ST ask him to stop, nor did she kick him during oral sex. Tr.

---

without good cause. See People v. Davison, 92 A.D.3d at 691-92. The squabble over the prosecutor's discovery disclosures and case presentment continued at trial, where defense counsel asked the trial judge to strike the testimony of SB and ST in light of the People's failure to produce several pieces of relevant evidence, including recordings of 911 calls, dispatch and communication records, and various police forms and notes. Tr. 1123-29. The trial judge declined to strike this testimony but did agree to give a permissive adverse inference charge to the jury with regard to the missing evidence. Tr. 1148-49.

1001-02. Petitioner testified that he again wore a condom during sexual intercourse with ST, but this condom, too, broke. Tr. 1003.

D.    The Closing Statements

The defense summation followed suit. Counsel argued that ST's story did not make sense. For starters, counsel noted that the police did not respond to ST's house until hours after ST allegedly arrived home. Tr. 1189. (The missing evidence, presumably, bore on this point.) Counsel also highlighted the police testimony that ST was not hysterical and her clothing was not in disarray, in contradiction to Carson's testimony. Tr. 1189-90. Also prominent in defense counsel's closing arguments were ST's medical records, which showed no sign of physical abuse – lending support to Davison's story. Tr. 1190-91. The argument did not stop there, with counsel offering the theory that ST and Davison had consensual sex, and, afterward, ST sought revenge against him for his casual post-sex treatment of her. Tr. 1199. In a similar vein, counsel challenged SB's testimony claiming that she had been raped in Davison's car. The cry of rape was preposterous, defense counsel argued, because Davison could not have positioned himself in ways that would physically permit him to perform the acts SB testified he did. Tr. 1212-13. The sex had to have been consensual and unforced, or so the argument went. Lastly, defense counsel noted that the officers who met SB at the police station did not see signs of physical abuse – again supporting Davison's tale of consensual sex. Tr. 1215-16.

The prosecution closed on the dual, amazingly similar predatory episodes, emphasizing that, despite trying, the defense had not offered a credible argument as to why two separate women, who, before, did not know each other, had, a year apart in time, supposedly fabricated a rape claim against Davison. Tr. 1231-32. (After Davison took the stand, there was, of course, no issue that intercourse had occurred.) With the similarity of the two victims' stories being a

7

bedrock part of the People's case, the prosecution homed in on Davison's claim that in both cases, consensual sex ended with a broken condom, arguing, "Then there's the issue of the broken condom. This is the real reason why the defendant is the unluckiest man in America. Both women who happen to accuse him of raping him [sic], the condom breaks leaving his DNA in the vagina . . . ." Tr. 1242. Practically speaking, Davison had, by taking the stand, made his own credibility the only issue. The People hammered home why the jury shouldn't believe the "he said," and they, ultimately, did not.

E.    Conviction and Sentencing

As part of its charge to the jury, the trial court instructed that the recordings of ST's 911 call, the complaint form completed by Officer Herbst, and certain of Detective Connors's notes had not been preserved and were unavailable to be offered in evidence. In line with its earlier ruling, the court went on to provide a permissive adverse inference charge against the People, advising the jury: "The fact that these documents and 911 calls were not retained by the police department permits, but does not require, an inference that had this evidence been retained, it would not have supported the People's position and would have been favorable to the defense." Tr. 1269-70. The net practical effect of the instruction was to focus the jury's attention on Davison's testimony – the jury was free to infer, if it chose, that the missing evidence would have bolstered petitioner's account.

The jury, presumably, chose not to do so, finding Davison guilty of two counts of rape in the first degree, two counts of criminal sexual act in the first degree, one count of sexual abuse in the third degree, and two counts of rape in the third degree. Tr. 1338-39. For these crimes, the trial court sentenced Davison to prison terms aggregating 15 years. Sentencing Transcript of

Record, People v. Davison, Indict. No. 2890/2007 (Sup. Ct., Queens Cty., March 26, 2009) at 12-15.

F.    Post-Trial Proceedings

In January 2011, Davison appealed his convictions to the Appellate Division, Second Department, arguing that the trial court's denial of his severance motion denied him due process rights. Then, at the encouragement of his attorney from Appellate Advocates, Davison filed a pro se supplemental brief in the Appellate Division, in which he attacked his convictions on several additional grounds. On February 7, 2012, the Second Department entered its decision upholding the trial court's denial of Davison's motion to sever the counts relating to SB's rape from the counts relating to ST's rape, holding that no good cause had been provided to excuse the motion's untimeliness. People v. Davison, 92 A.D.3d at 691-92. The Second Department also rejected the claims raised in Davison's supplemental brief, holding that they were unpreserved, procedurally improper and without merit. Id. On February 29, 2012, Davison sought leave to appeal to the Court of Appeals, which was denied on April 6, 2012. People v. Davison, 18 N.Y.3d 993, 968 N.E.2d 1004, 945 N.Y.S.2d 648 (2012).

On a separate and distinct front, on February 7, 2011, Davison filed a civil rights action, under 42 U.S.C. § 1983, against Detective Kellner and the assistant district attorney who had prosecuted him, alleging that they had conspired to destroy evidence and had joined with two court reporters, who were also named defendants, to alter the trial transcript so as to prevent him from winning a new trial on appeal. See Davison v. Reyes, No. 11-CV-167, Dkt. No. 1 (E.D.N.Y. Feb. 7, 2011). That action was dismissed on defendants' motion. Davison v. Reyes, No. 11-CV-167, 2012 WL 948591 (E.D.N.Y. Mar. 20, 2012). A few weeks later, on May 7,

2012, Davison filed his petition for a writ of habeas corpus, advancing many of the same arguments he had raised on direct appeal.[4]

## Standards Controlling Habeas Review

Under the Anti-terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts" in light of the evidence presented. 28 U.S.C. § 2254(d); see also Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. Harrington v. Richter, 131 S. Ct. 770, 785 (2011); see also Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, 131 S. Ct. at 786 (2011) (internal quotation marks omitted). Review under AEDPA "demands that state-court decisions be given the benefit of the doubt." Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (internal quotation marks omitted). Where AEDPA deference applies, "[a] state court's findings of fact are 'presumed to be correct' unless

---

[4]     Davison requested several extensions of the deadline to file his reply brief, and, ultimately, filed the brief late, in separate filings, and with various parts hand-written (with typed versions sent after). Nevertheless, since Davison is proceeding pro se, the Court considers his reply on the instant application.

10

rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

Habeas corpus jurisprudence, given these ground rules, is well-cabined. For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 364, 120 S. Ct. 1495, 1498, 146 L. Ed. 2d 389 (2000). A state court decision is "contrary to clearly established federal law," within the meaning of § 2254(d), if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. Id. at 405-06. A state court decision is classified as one resting on an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of" the case. Id. at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. Id. at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000). However, a federal court may reverse a state court ruling only where it is "so lacking in justification that there [is no] possibility for fairminded disagreement." Vega v. Walsh, 669 F.3d 123 (2d Cir. 2012) (quoting Harrington, 131 S. Ct. at 786–87). "If this standard is difficult to meet – and it is – that is because it was meant to be." Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (internal quotation marks omitted). Federal courts should not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas review is the remedy." Id. (citation omitted).

Moreover, review under § 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011). A federal court may look beyond the state court record, however, when the petitioner can demonstrate that "the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involving an unreasonable application' of federal law." Id. at 1411 n.20.

Discussion

A.    The Missing Evidence

1)  Alleged Brady Violations

Davison alleges that the prosecution "deliberately destroyed exculpatory evidence . . . that would have resulted in a markedly weaker case for the State." (Pet. Br. at 9).[5] While petitioner offers no factual support, either now or in the state proceedings, for his claim of deliberateness, it is beyond question that certain potentially exculpatory materials pertaining to the investigation and prosecution were lost or destroyed before trial. (See Background, section E, supra; see also Tr. 11-12; 1269-70). Petitioner contends that these items constituted Brady material that the People were required to turn over to him. (Pet. Br. at 9).[6]

---

[5]    Petitioner did not file an initial memorandum of law in support of his petition. Support for the petition is drawn from the petition itself and, where noted, his reply brief (Dkt. No. 23, "Rep. Br.").

[6]    At trial and on appeal, Davison argued that certain of these items constituted Rosario material as well. That claim was not raised by Davison in his habeas petition, though it is referred to in his reply. (Rep. Br. at 3-4). In any event, whether properly preserved or not, it is well established that the withholding of Rosario material does not constitute a violation of a clearly established federal constitutional right, and, thus, is not, even if improperly denied, a right upon which federal habeas relief can be granted. See Cruz v. Scully, 716 F. Supp. 766, 769 n.5 (S.D.N.Y. 1989); U.S. ex rel. Butler v. Schubin, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), aff'd without opinion, 508 F.2d 837 (2d Cir. 1975).

12

There is, of course, no question that the prosecution is required to provide the defense all exculpatory evidence it has in its possession under the landmark holding more than 50 years ago in Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Its progeny are legion and enforce the understanding that Brady specifically requires that the prosecution "turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S. Ct. 989, 1001, 94 L. Ed. 2d 40 (1987) (citing Brady). There are three factors to be examined where a violation of Brady is claimed; that is, whether "(1) the [prosecution], either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001) (citation omitted). Prejudice is measured by whether the "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).

Case law also points out, however, the prosecution does not have an obligation to disclose evidence whose value to the defense is unknown or speculative. See, e.g., United States v. Agurs, 427 U.S. 97, 109-10, 96 S. Ct. 2392, 2400, 49 L. Ed. 2d 342 (1976) holding modified by United States v. Bagley, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). Accordingly, "the omission must be evaluated in the context of the entire record." United States v. Agurs, 427 U.S. at 112.

13

Now, given the dimensions of the issues framed at trial, it is hardly surprising that it so dominated Davison's direct appeal. This question, as a result, was fully adjudicated on the merits by the state courts. In Supreme Court, Justice Roman, as noted earlier, responded to Davison's <u>Brady</u> objection arising from the missing evidentiary material and granted relief to the extent that a permissive adverse inference charge was read to the jury (Tr. 1269-70). The Second Department, in light of this relief, found this claim of constitutional violation to lack merit. <u>See</u> <u>People v. Davison</u> at 691. That became the final word from the state courts when the Court of Appeals denied leave. Thus, on this litigation history, to overcome the deference owed under AEDPA to the state courts' adverse adjudication of his claim, Davison must meet the heightened burden of demonstrating that the state court adjudication was "contrary to" or involved an "unreasonable application of" clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Petitioner fails to carry that burden. But, in attempting to meet it, he contends that the "favorable evidence the state failed to disclose to the petitioner could have made a different result because it fit right in to the defense theory of consent," [sic] (Rep. Br. at 23). At the same time, he offers no support for this self-serving contention. Defense counsel gave a more nuanced assessment of this missing evidence at trial, noting that the 911 calls "go directly to the hotly contested issue of consent" (Tr. 1130). Nonetheless, going directly to a contested issue is a far cry from evidence that tends to favorably decide that issue. Indeed, there is no reason to believe the 911 calls would have helped Davison's case as opposed to the People's case. The state court rulings were, in any event, clearly reasonable applications of Supreme Court precedent, as the value of the lost or destroyed evidence to Davison was entirely speculative, and, in line with the standards set forth by the Supreme Court, not established <u>Brady</u> material. <u>Agurs</u> at 109-10. As

14

such, the permissive adverse inference instruction provided by the trial court was constitutionally adequate. See United States v. Bagley, 473 U.S. at 678.

Davison has, therefore, failed to meet the heavy burden established by the AEDPA of showing that the state court rulings on his Brady claim were contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or were based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, the claim is dismissed.

    2) Right to Confront Witnesses

Relatedly, petitioner argues, as he did in his pro se supplemental brief filed with the Second Department, that these alleged Brady violations "[d]enied [him] a full and fair opportunity to confront and cross-examine [his accusers] during trial due to the destruction of the favorable exculpatory and impeachment evidence." (Pet. Br. at 21). Should it occur, denial of a defendant's opportunity to impeach a witness is subject to harmless-error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). Whether such error is harmless beyond a reasonable doubt depends on several factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Delaware v. Van Arsdell, 475 U.S. at 684.

The factors articulated by the Supreme Court in Arsdell plainly support the state court rulings and militate against Davison's claim. While certain of the lost evidence pertained to accounts given of the assaults, and may have proved helpful in confronting SB and ST, the main witnesses against him, Davison had a full and fair opportunity to cross-examine both SB and ST

15

at length. (See Tr. 443-525; 663-705; 714-41; 755-57.) Moreover, as noted above, SB and ST's accounts were corroborated by DNA and other forensic evidence, and together made a compelling case. Furthermore, by taking the stand, Davison essentially confirmed all of the material testimony given by the victims, save the absence of consent. Even if this review were de novo, no claim of deprivation of the right to confront accusing witnesses can be supported on these facts. Nor could it survive harmless error analysis. Petitioner's failure to reply to respondent's argument here says as much. By extension, petitioner fails, axiomatically, to meet the much higher standards set forth by AEDPA. The claim is dismissed.

B.     Ineffective Assistance of Counsel

Davison asserts that his appellate attorney provided constitutionally ineffective assistance to him because he failed to file, or explain to him how to file on his own, a motion to settle the transcript, which Davison claims suffered from errors and omissions. Pet. Br. at 27. Though cloaked in the guise of appellate counsel's ineffectiveness, the substance of Davison's argument is focused on the underlying failure to correct the trial transcript. Yet, either way, as the People correctly observe, Davison's remedies for this claim have not been exhausted, as he has never filed, but still can file at any time of his choosing, a state-court motion for a writ of error coram nobis. Resp. Br. at 15.[7] Accordingly, this claim is unexhausted and is, as a matter of law, not ripe for habeas review. 28 U.S.C. § 2254(b)(1)(A).

And at that, petitioner can still overcome this procedural bar if he could demonstrate either that (i) "there is an absence of available state corrective process," which he cannot because

---

[7]     Additionally, although not mentioned by the People, petitioner has not filed, and presumably can still file, a state-court motion under C.P.L. § 440.10 challenging his conviction. What is important now is not the potential means of remedy, but that petitioner has never exhausted *any* of the state court remedies available to obtain relief on the federal constitutional claims he advances.

one exists, or (ii) "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i) and (ii). Petitioner, dispositively, fails to meet the burden on either prong. He acknowledges, in fact, that he has not yet filed a motion in state court for error coram nobis or for any other post-conviction remedy, but attempts to justify this failure by claiming that "any error coram nobis filed would only be denied." Rep. Br. at 10. It hardly needs stating that petitioner's feeling of pessimism alone is not a viable justification for his failure to even try to exhaust state remedies, and he offers no other excuse. Habeas relief on this ground must be denied.

As a post-script, the Court observes that even on de novo review of these constitutional claims, the same result would most certainly obtain. Strickland v. Washington provides the well-known, two step framework for analyzing ineffective assistance of counsel claims. 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, a petitioner must overcome the strong presumption that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment" by showing that his counsel failed to act "reasonabl[y] considering all the circumstances." Pinholster, 131 S. Ct. at 1403 (quoting Strickland, 466 U.S. at 690, 688). Second, the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The "reasonable probability" standard "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Pinholster, 131 S. Ct. at 1403 (quoting Harrington, 131 S. Ct. at 792). Because of the inherently deferential nature of the Strickland standard, "[a] criminal defendant has a high burden to overcome to prove the [constitutional] deficiency of counsel." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006). This is especially the case for petitioners, like Davison, challenging the effectiveness of appellate

17

counsel. See, e.g., Richburg v. Hood, 794 F. Supp. 75, 78-79 (E.D.N.Y. 1992) ("[t]he decision of appellate counsel to choose among plausible options of appellate issues is preeminently a strategic choice and is virtually unchallengeable") (internal quotation marks omitted).

Given the controlling law, if Davison had irrefutable proof of the transcript errors and omissions, perhaps he would meet this high bar. But he does not. Davison provides no evidence other than his own recollection to suggest that the trial transcript is flawed. It is hard to credit the argument that his attorney failed to act "reasonabl[y] considering all the circumstances," Pinholster, 131 S. Ct. at 1403, in declining to advance an essentially baseless claim. But even if Davison could meet the first Strickland standard, it is impossible to conceive how he could demonstrate substantial likelihood of a different outcome, id., since the purported errors he cites are negligible at best. See, e.g., Rep. Br. at 56 ("[T]he appellant's response before being sentenced is inaccurate and should state 'I apologize to the court for being in this predicament,' and [instead] only states 'I apologize to the court[.]'") For these reasons, petitioner's application for habeas relief based on ineffective assistance of appellate counsel must be denied.[8]

---

[8]     Davison's appellate counsel explicitly advised Davison that he did not intend to raise this issue in his main brief and encouraged him to do so in a supplemental brief. See Dkt. No. 24-1 at 4 (letter from appellate attorney advising Davison that he "do[es] not intend to do anything further" with Davison's contentions regarding the transcript and that "[s]ince you feel so strongly about it, it would probably be a good issue to develop in a pro se appellate brief.") Davison complains that this advice was misguided, as the Second Department held that the accuracy of the trial record needed to be raised in a motion to resettle the record prior to Davison's appeal. See People v. Davison, 92 A.D.3d at 692. However, even if petitioner's appellate attorney erred in this advice, such error was harmless, since, through no fault of Davison's appellate attorney, he had already defaulted on his chance to raise this argument at trial. Stated differently, the claim was not preserved for state appellate review and falters fatally here for the same reason his Brady claim failed.

C.    Misconduct by the trial judge and prosecutor[9]

Petitioner next raises a laundry list of claims of misconduct by the trial judge and prosecutor, none of which has merit.

1. Trial judge

Davison argues that the trial judge's biased behavior during trial violated the fundamental fairness owed to him – a claim dismisses on the merits by the Second Department on appeal. People v. Davison, 92 A.D.3d at 691-92. Davison provides only one example of the judge's allegedly improper behavior: her statement to the prosecutor to "ask the leading question so we don't have to worry about [that]." Pet. Br. at 29; see also Tr. 553.

The Due Process Clause of the Fourteenth Amendment requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. See Bracy v. Gramley, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 1797, 138 L. Ed. 2d 97 (1997). That said, defendants are entitled to a fair trial, not a perfect one. Only judicial misconduct that renders the trial so fundamentally unfair as to violate federal due process under the Constitution triggers habeas relief. See Gayle v. Scully, 779 F.2d 802, 806 (2d Cir.1985), cert. denied, 479 U.S. 838 (1986); United States v. Robinson, 635 F.2d 981, 984 (2d Cir.1980), cert. denied 451 U.S. 992 (1981). More specifically, habeas relief on the ground of judicial misconduct at the state trial level is warranted only if the federal court determines that the alleged improprieties, taken in the context of the total trial, undermined fundamental fairness to the defendant as guaranteed by the Constitution. Daye v. Attorney Gen. of State of N.Y., 712 F.2d 1566, 1571 (2d Cir. 1983).

---

[9]    To the extent Davison argues that certain of the misconduct he charges against the trial judge is not reflected in the allegedly error-riddled trial transcript, this claim suffers from the same deficiencies, and fails for the same reasons, outlined in Discussion, section B, supra.

Even if this Court were not bound by AEDPA to review the state court decision with deference, given the weakness of Davison's claim, it would still find for respondent. The trial judge's comment, which may appear biased at first blush, reveals itself, at worst, as harmless upon a full review of the context. In a sidebar with both the trial judge and defense counsel, the prosecutor asked permission to "lead [the witness] through the next couple of questions" so as, apparently, to prevent unnecessary bias *against* Davison. Tr. 551-52. Defense counsel informed the prosecutor that his precautions "do[n't] matter" because "[m]y client is going to testify" and "[i]t's going to come out anyway." Tr. 553. After this exchange – in other words, after receiving defense counsel's permission – the trial judge instructed the prosecutor to "ask the leading question." Id. This exchange can hardly be said to violate fundamental fairness to Davison. See Daye v. Attorney Gen. of State of N.Y., 712 F.2d at 1571. While petitioner alludes to other misdeeds, he provides no examples, and none are apparent from the trial record. Therefore, his application for habeas relief on this ground is baseless.

2) Prosecutor

a) Grand jury hearing

This claim was dismissed on the merits by the Second Department. Taking exception, Davison contends that the "prosecutor's misconduct during the [g]rand [j]ury proceedings . . . denied [him] the right to confront and challenge the complainant's testimony, and the right to present a witness to establish a defense[.]" Pet. Br. at 15. He is specifically aggrieved by the prosecutor's failure to provide the full history of the investigation into SB's rape claim to the grand jury, which, he believes, would have undermined the prosecutor's case. Rep. Br. at 50.

This argument is easily dealt with, as the constitutional rights that Davison seeks to vindicate do not exist. See, e.g., Fields v. Soloff, 920 F.2d 1114, 1118 (2d Cir. 1990) ("The Fifth

20

Amendment right to indictment by a grand jury was not incorporated by the Due Process Clause

of the Fourteenth Amendment, and, accordingly, does not pertain to the states."). As a result,

claims arising from state grand jury proceedings are not suitable for habeas relief. See, e.g.,

Mirrer v. Smyley, 703 F. Supp. 10, 11-12 (S.D.N.Y.) aff'd, 876 F.2d 890 (2d Cir. 1989), cert.

denied, 493 U.S. 850 (1989) ("[T]here is no federal constitutional right to a grand jury in a state

criminal proceeding. The right to a grand jury is a matter of New York State law and as such is

not reviewable on a petition for habeas corpus."). The state court decisions cannot be contrary to

constitutional protections that are merely imaginary. This claim is, therefore, summarily

dismissed.

> b) At trial

Petitioner makes two separate claims arising from the prosecutor's conduct at trial. First,

he argues that the prosecutor improperly mingled the facts of the two rapes in his summation;

second, he argues that the prosecutor knowingly elicited false testimony from witnesses. Neither

claim has merit.

> i)    Commingling of cases on summation

Davison contends that the prosecutor's summation improperly "commingl[ed] evidence"

from the two rapes, thus unfairly prejudicing the jury, which was required to weigh the incidents

separately. Pet. Br. at 33. As the People note, however, the Second Department rejected this

argument as unpreserved for state-court appellate review, since Davison failed to raise an

objection at the trial level as required by C.P.L. 470.05[2]. See People v. Davison, 92 A.D.3d at

691-92 (holding that Davison's challenges to the prosecutor's summation were unpreserved for

appellate review).

The Supreme Court has made clear that federal courts must refrain from granting habeas

relief on a claim that has been barred from state-court review on procedural grounds. See

Coleman v. Thompson, 501 U.S. 722, 729-32, 111 S. Ct. 2546, 2554-55, 115 L. Ed. 2d 640

(1991) (holding that the "independent and adequate state ground doctrine" serves to "bar federal

habeas when a state court declined to address a prisoner's federal claims because the prisoner had

failed to meet a state procedural requirement"). Since Davison has defaulted on this claim at the

state level, it is improper for this Court to grant it on habeas review, and it is denied on that

basis.[10]

> ii)     Eliciting false testimony at trial

Davison also argues that the prosecutor produced certain evidence that the prosecutor

"was aware . . . [was] based on perjured testimony." Pet. Br. at 11. Chief among the challenged

evidence are the production of ST's aunt Sheba Carson, whom ST had not mentioned in the

grand jury hearing (Tr. 599-600), and Carson's testimony regarding the disarray of ST's clothes,

hair and nails (see, e.g., Tr. 618 and 622) in contradiction to the testimony of Officer

Kontorovich, who responded to ST's 911 call the morning after her rape (see, e.g., Tr. 932).[11]

---

[10]     Nevertheless, this holding does not suggest any disagreement with the Second
Department in finding that this claim, in addition to being procedurally barred, lacks merit.
People v. Davison, 92 A.D.3d at 692. The prosecutor's "commingling" of evidence was, in
many instances, a necessary tactic to counter Davison's own defenses. Specifically, Davison
attempted to explain the positive matches for his DNA by claiming that, in both cases, his
condom broke. Tr. 1003 (stating that "the condom broke *again*" with ST) (emphasis added),
1243. The prosecutor responded to this defense by noting that this type of coincidence would
make Davison the "unluckiest man in America." Tr. 1242. To prevent the prosecutor from
making this obvious point would be to bar him from rebutting testimony that Davison himself
offered from the stand linking his conduct in each incident.

[11]     In his reply, Davison also purports to cite to a police report showing that ST did not
mention her aunt as being one of the people she spoke with upon arriving home after the rape.
Rep. Br. at 25. However, the exhibit that Davison points to is not a police report but rather his
own motion for permission to file a supplemental brief. Compare Rep. Br. at 25 ("[ST] made no

These claims were rejected on the merits by the Second Department. People v. Davison, 92
A.D.3d at 691-92.

It is well-established that comments and decisions made by a prosecutor at trial, if
improper, constitute "trial errors" that are subject to harmless error analysis. See, e.g., United
States v. Gonzalez-Lopez, 548 U.S. 140, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006); Arizona v.
Fulminante, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). Moreover, in the context
of habeas petitions, such state-court errors should be found harmless unless they had a
"substantial and injurious effect" on the verdict. See Fry v. Pliler, 551 U.S. 112, 121-22, 127 S.
Ct. 2321, 2328, 168 L. Ed. 2d 16 (2007).

As an initial matter, Davison offers no evidence that these pieces of evidence were false
but only that, in certain cases, that they contradicted each other. But testimony reflecting such
minor inconsistencies – especially testimony following severe trauma like rape – speaks more
readily to the difficulties of memory than to the probability of deception. Nor does the
prosecution's alleged awareness of these contradictions, Pet. Br. at 25, speak to bad intentions,
since this testimony all "occurred during presentation of the case to the jury" and so its effect
was "quantitatively assessed in the context of other evidence." United States v. Gonzalez-Lopez,
548 U.S. at 148. This is the transparency of truthful but inconsistent recollection, not mendacity.
Davison's claim, therefore, does not support habeas relief.

D.    Failure to Prove Guilt Beyond a Reasonable Doubt

Finally, petitioner argues that the People presented "legally insufficient evidence" (Pet.
Br. at 17) that "failed to prove every element beyond a reasonable doubt." (Pet. Br. at 3). This

_____

mention of her aunt being a contact witness at her home according to Det. Kellner's First
Synopsis Report . . . (See: appellant's exhibit A)" [sic] with Dkt. No. 24-1 (Notice of Motion for
permission to file a supplemental pro se brief, labeled "Exhibit A").

claim, too, was rejected on the merits by the Second Department. <u>People v. Davison</u>, 92 A.D.3d at 691-92. And, properly so.

Indeed, this claim requires little discussion because of the heavy burden Davison must carry to win the writ. A state-court conviction may be overturned only if the reviewing court finds that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. at 308. Given the evidence discussed above – especially the DNA evidence linking Davison to two separate and independent rape claims and petitioner's admission of having intercourse with the victims at the time and place charged – it is manifestly not the case that "no rational trier of fact" could have convicted him. Even if the court were to credit the petty nits that Davison raises in his brief, such as ST's difficulty recalling exact times from the night of her rape and varying testimony about ST's appearance after her rape, these discrepancies would hardly eclipse the mountain of evidence against him. For these reasons, this claim is totally devoid of merit.

Conclusion

For the reasons outlined above, Darnell Davison's petition for a writ of <u>habeas</u> <u>corpus</u> is dismissed and the writ is denied.

Since Davison has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore <u>in forma pauperis</u> status is denied for purpose of an appeal. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to enter judgment in favor of respondent and to close this case.

24

So Ordered.

Dated: Brooklyn, New York
      November 22, 2015

/S/ USDJ VITALIANO

ERIC N. VITALIANO
United States District Judge